ROCKY MOUNTAIN HEALTH MAINTE-
NANCE ORGANIZATION, INC., a Colo-
rado nonprofit corporation, Plaintiff–
Appellee,

v.

COLORADO DEPARTMENT OF
HEALTH CARE POLICY AND FI-
NANCING, by and through its Executive
Director, James RIZZUTO, Defendant–
Appellant.

No. 00CA1517.

Colorado Court of Appeals,
Div. IV.

Sept. 13, 2001.

Rehearing Denied Dec. 6, 2001.

Certiorari Denied Aug. 26, 2002. *

* Justice KOULIS would grant as to the following issues:

Whether the lower court erred by reexamining the calculations made by the Colorado Department of Health Care Policy and Financing (the "Department"), and using that reexamination to find Colorado in breach of those contracts.

Whether the lower court erred when it relied on parole evidence, in the form of opinion testimony and evidence of course of dealing, to vary the terms of the contract payment rates, thereby substantially increasing the State's financial liability.

Hale, Hackstaff, Tymkovich & Erkenbrack, Stephen K. Erkenbrack, Timothy M. Tymkovich, Denver, CO; Hoskin, Farina, Aldrich & Kampf, P.C., David M. Scanga, Matthew G. Weber, Laurie A. Cahill, Grand Junction, CO, for Plaintiff–Appellee.

Ken Salazar, Attorney General, Barbara A. McDonnell, Assistant Attorney General, Richard L. Webb, Assistant Attorney General, Denver, CO, for Defendant–Appellant.

Opinion by Judge ROTHENBERG.

In this dispute concerning the calculation of Medicaid capitation rates, defendant, Colorado Department of Health Care Policy and Financing, appeals the trial court's judgment following a bench trial finding it liable to plaintiff, Rocky Mountain Health Maintenance Organization, Inc. (RMHMO). We affirm.

## I. Background

The department is the state agency responsible for administering the State of Colorado's Medicaid program, a cooperative federal and state program that provides medical services to individuals otherwise unable to meet the costs of such services. The department contracts with private parties to provide the medical services to its Medicaid recipients.

RMHMO is a nonprofit managed care corporation that entered into three contracts with the department to provide medical services to certain Medicaid recipients for the fiscal years 1997–1999. Those three contracts are the subject of this dispute.

### A. Statutes and Regulations

Federal law requires those that choose to participate in the Medicaid program, such as the department, to set rates on an actuarially sound basis. *See* § 42 U.S.C. 1396b(m) (2000).

Certain state regulations also restrict rate settings. Under § 8.211.08, 10 Code Colo. Regs. 2505–10 (1997), capitation rates, the premiums per recipient, must be established in accordance with actuarial principles after considering the medical and administrative costs of covered services. Colorado has also established restrictions governing the upper and lower limits for health maintenance organization's capitation rates. *See* § 26–4–119(1)(a), (b), C.R.S.2000.

## B. Contracts

The parties used one basic form for the three contracts in issue here. The effective date of each contract was July 1 of the relevant fiscal year. The contracts require that the department pay a capitation rate that is a fixed monthly payment.

Exhibit B of each contract provides the rates. The contracts state that the rates set forth in Exhibit B are calculated based on a seven-step process which provides for:

(1) calculating fee-for-service expenditures under a prior fiscal year;

(2) adjusting for inflation by applying a trend to project rates to the rating period;

(3) adjusting for any significant prospective financial events;

(4) counting the number of fee-for-service eligibles and adjusting them for projected case mix;

(5) dividing projected costs by projected eligibles;

(6) multiplying the result by 95 percent; and

(7) possibly adding administrative costs.

In addition, the contracts expressly incorporate applicable federal and state laws and provide that:

[t]his contract shall be governed and construed in accordance with the laws established in Article 16, Title 10, Colorado Revised Statutes, as amended, hereinafter referred to as the Colorado Health Coverage Act, and as defined in 42 United States Code 300e, hereinafter referred to as the Health Maintenance Organization Act of 1973, as amended, Article 4, Title 26, Colorado Revised Statutes, Title XIX of the Social Security Act, and all pertinent Department regulations of the Colorado Department of Health Care Policy and Financing Staff Manual Volume VIII, as amended. The laws of the United States of America shall be governing in the event of a conflict or any inconsistency with the laws of the State of Colorado.

## C. Current Litigation

At the bench trial, RMHMO asserted that the department had miscalculated the capitation rates for each year of the contracts and that these miscalculations had resulted in a breach of contract, causing damages to RMHMO.

The facts were largely undisputed and the department presented little evidence at trial. It was undisputed that: (1) the department had a duty to calculate annually the specific dollar amounts of the capitation rates based on data from previous fiscal years; (2) these calculations involved the analysis of massive amounts of data and took months to complete; (3) as a result, the capitation rates were not finalized by the July 1 effective date of the contracts; (4) these parties had contracted with each other since the 1970s; and (5) they had an understanding that the department would voluntarily correct any rate errors that were later discovered.

The testimony also showed that the parties had customarily and routinely corrected rate errors prior to 1996. However, in 1996, the department hired a new director, and at his directive, it had ended the practice of correcting any rate errors discovered later by RMHMO.

The department asserted some defenses to RMHMO's action, but its primary contention at trial and on appeal is that, even assuming the department miscalculated the capitation rates, RMHMO lacks a remedy at law. According to the department, there were extensive negotiations between RMHMO and the department as part of the ratesetting process; the department could have cancelled the contract if it was not satisfied by the rates; and the seven-step process was not intended as an exact calculation.

However, a department employee testified at trial that the department unilaterally had set the rates, and an RMHMO representative also testified that RMHMO lacked any meaningful input into the rate-setting process. The director, who testified as the department's representative, conceded that state and federal laws and the seven-step process apply to the department when it sets rates under the contracts.

The department had hired an actuarial firm to conduct a review of the department's rates, and one actuary testified that he had discovered at least fifteen errors in the department's rate calculations. RMHMO presented other actuarial reports and evidence that the Colorado General Assembly had ordered an audit of the department's rate calculations.

The evidence also included an e-mail from a department employee to his co-workers admitting that he had miscalculated a portion of the rates. The same employee testified that he was certain the department had both underpaid and overpaid the rates in the past.

As to damages, RMHMO presented evidence from an actuarial firm that had reconstructed and analyzed the rates for the three years at issue. The firm reported that RMHMO had suffered $21,320,341 in damages from the miscalculations.

D. Trial Court's Findings and Conclusions

After hearing the evidence, the trial court made oral findings of facts and conclusions of law from the bench and directed RMHMO's counsel to submit a written order and judgment, which the court later executed.

The court found that the contracts required the department to follow the seven-step process and the applicable state and federal laws in setting the capitation rates; the parties had signed the contracts with the understanding that Exhibit B would be changed to reflect the proper rates conforming to the seven-step process if the rates were later found to have been miscalculated; and before the disputed period, the department had corrected the rates when errors were discovered in its calculations. The trial court further found that:

[A]s a factual matter, . . . the parties never treated the contracts as fully integrated. Second, the sevenstep formula for calculating the rates is an express term of the contract, and the department's breach can be, and has been, determined by reference to the formula contained within the four corners of the contract. Third, to the extent that the various versions of the rates calculated by the department conflicted with those derived from the correct appli-

cation of the formula, the contracts were ambiguous, and the parties' course of conduct showed that if changes needed to be made to make Exhibit B accurate, those changes would be made in accordance with the parties' true agreement that the department set the rates based on the correct application of the formula.

. . . .

I [also] find that the monthly payments to RMHMO during the years in dispute were based on improperly computed rates.

The trial court thus concluded the department had breached the contracts and had violated applicable state and federal law, and it awarded RMHMO damages in the amount of $15,000,000, plus interest and costs.

II. Governmental Immunity

■ Initially, we reject the department's contention that the trial court exceeded its jurisdiction because RMHMO's claim was, in fact, a tort claim and was barred by the Colorado Governmental Immunity Act (CGIA).

■ The applicability of sovereign immunity is a question of law that can be raised at any stage of the proceeding. *Jordan v. City of Aurora,* 876 P.2d 38 (Colo.App.1993).

Under the CGIA, § 24–10–101, et seq., C.R.S.2000, a party may not initiate an action against a public entity for an injury that lies in tort or could lie in tort, regardless of whether a tort claim is asserted. *See City & County of Denver v. Desert Truck Sales, Inc.,* 837 P.2d 759 (Colo.1992).

■ In determining whether a claim is barred under the CGIA, the dispositive question is not how the claim is characterized, but whether it is or could be a tort claim. *City & County of Denver v. Desert Truck Sales, Inc., supra.*

■ The CGIA does not apply to actions grounded in contract. *Berg v. State Board of Agriculture,* 919 P.2d 254 (Colo.1996); *Grimm Construction Co. v. Denver Board of Water Commissioners,* 835 P.2d 599 (Colo.App.1992)(summary judgment in error because public entity not immune from con-

tráct claims). Thus, if the claims are for breach of obligations arising from the terms of a contract, the public entity is not immune. *See Elliott v. Colorado Department of Corrections*, 865 P.2d 859 (Colo.App.1993).

Here, the parties agree they are bound by the three contracts, and RMHMO provided overwhelming evidence at trial that the department had breached the contracts by failing to calculate the rates in accordance with the language of the contracts and governing Medicaid payment rates.

In addition, the trial court expressly found that liability arose from the contracts executed between the department and RMHMO, and while there was evidence at trial showing several department employees had misled RMHMO, that was not the basis of RMHMO's lawsuit.

Accordingly, we conclude RMHMO's action against the department was grounded in contract law and therefore is not barred by sovereign immunity.

### III. Adequacy of Court's Findings

We also reject the department's contention that the trial court failed to make adequate findings of fact and conclusions of law in its oral remarks after trial and in its later written judgment.

■ Under C.R.C.P. 52(a), the trial court's judgment must contain findings of fact and conclusions of law sufficiently explicit to give an appellate court a clear understanding of the basis of its order. *In re Marriage of Van Inwegen*, 757 P.2d 1118 (Colo.App.1988).

■ However, there is sufficient compliance with the rule "if the ultimate facts have been determined and conclusions of law are entered thereon." *Manor Vail Condominium Ass'n v. Town of Vail*, 199 Colo. 62, 68, 604 P.2d 1168, 1172 (1980).

■ Despite a trial court's characterization of its oral remarks at the end of a trial as "findings and conclusions,"

the court has the authority to supplement and modify the opinions it expressed in its oral remarks until the date judgment formally enters. Consequently, an order or judgment must be reduced to writing and

dated and signed before it is a final, appealable order.

*People in Interest of O.J.S.*, 844 P.2d 1230, 1233 (Colo.App.1992) (citations omitted), *aff'd sub nom. D.A.S. v. People*, 863 P.2d 291 (Colo.1993).

■ Although appellate courts may scrutinize a trial court's findings when they have been adopted from those proposed by a litigant, the trial court's use of such findings is not erroneous if supported by competent evidence in the record. *Municipal Subdistrict v. OXY USA, Inc.*, 990 P.2d 701 (Colo. 1999).

On appeal, the court will assume that the trial judge examined the proposed findings and agreed that they correctly stated the facts as he himself found them to be; otherwise, he would not have adopted them as his own. It is only when the findings themselves are inadequate and do not indicate the basis for the trial court's decision that the judgment will be reversed.

*Uptime Corp. v. Colorado Research Corp.*, 161 Colo. 87, 93, 420 P.2d 232, 235 (1966) (citation omitted).

■ Here, the trial court acted well within its authority in executing written findings, conclusions of law, and entry of judgment after its oral statements. *See People in Interest of O.J.S., supra.* We also observe that the written judgment closely follows the trial court's oral statements.

■ Because the trial court's findings indicate the basis for its decision, *see Municipal Subdistrict v. OXY USA, Inc., supra; Uptime Corp. v. Colorado Research Corp., supra,* we reject the department's contention that the court failed to provide adequate findings of fact and conclusions of law.

### IV. Breach of Contract

■ The department next contends that it satisfied its contractual obligation to make monthly payments and that the trial court thus erred in finding that it breached the contracts with RMHMO. In a related contention, the department also contends the court erred in admitting parol evidence. We reject both contentions.

■ Interpretation of the language of a contract and determination whether a contract is ambiguous are questions of law that we review *de novo. Branscum v. American Community Mutual Insurance Co.,* 984 P.2d 675 (Colo.App.1999); *Batterman v. Wells Fargo Ag Credit Corp.,* 802 P.2d 1112 (Colo. App.1990).

■ A contract term is ambiguous if it is reasonably susceptible to more than one meaning, but the potential for more than one interpretation does not, in itself, create ambiguity. *Allstate Insurance Co. v. Juniel,* 931 P.2d 511 (Colo.App.1996). To ascertain whether an agreement is ambiguous, the agreement's language should be construed in accordance with the plain and generally accepted meaning of the words employed. *USI Properties East, Inc. v. Simpson,* 938 P.2d 168 (Colo.1997).

■ In determining whether a contract is ambiguous, a court may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract. But, the court may not consider the parties' own extrinsic expressions of intent. *Cheyenne Mountain School District # 12 v. Thompson,* 861 P.2d 711 (Colo.1993).

■ Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to the plain language. *USI Properties East, Inc. v. Simpson, supra.* In order to effectuate the parties' intent, a contract must be construed as a whole, and effect must be given to every provision if possible. *Truck Insurance Exchange v. Eagle River Water & Sanitation District,* 17 P.3d 844 (Colo.App.2000).

■ Although the intent of the parties should be determined from the language of the contract itself, *see Humphrey v. O'Connor,* 940 P.2d 1015 (Colo.App.1996), where contract terms are vague or ambiguous, parol evidence may be admissible for the purpose of interpreting, explaining, or applying such terms. *Tripp v. Cotter Corp.,* 701 P.2d 124 (Colo.App.1985).

■ Once a contract is determined to be ambiguous, its interpretation becomes an issue of fact for the trial court to decide in the same manner as other disputed factual issues, *Pepcol Manufacturing Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984), and the trial court's findings of fact may only be disturbed when they are so clearly erroneous as to find no support in the record. *See FDIC v. Bowen,* 865 P.2d 868 (Colo.App. 1993).

In this case, the plain language of the contracts required that the department follow the seven-step process and relevant state and federal laws, and as outlined above, the relevant statutes mandate that the department set its rates on an actuarially sound basis. Nevertheless, while the trial court found that most of the language of the contracts was clear, it concluded the contracts were ambiguous "to the extent that the various versions of the rates calculated by the department conflicted with those derived from the correct application of the formula."

To resolve that ambiguity, the court examined the parties' course of conduct, which according to the trial court,

> showed that if changes needed to be made to make Exhibit B accurate, those changes would be made in accordance with the parties' true agreement that the department set the rates based on the correct application of the formula.

■ The department maintains that the trial court should have disallowed the testimony of RMHMO's actuarial experts about the parties' intent and should not have relied on such extrinsic evidence in reaching its result. We disagree and conclude that, under these circumstances, testimony concerning the parties' past practice of correcting rate mistakes was proper. *See Cheyenne Mountain School District # 12 v. Thompson, supra.*

The actuarial testimony showed that the department miscalculated the rates under the applicable seven-step process and state and federal law, and that during the fiscal years in issue, the department admittedly had deviated from the parties' past practice of correcting rate mistakes.

In sum, we conclude the trial court did not err in determining that the department breached the plain language of the contracts that required it to follow the seven-step process and relevant state and federal laws. Nor did it err in allowing the parties to present testimony of actuarial experts to show whether the department had miscalculated such rates under the applicable process and law, and also allowing testimony concerning the parties' past practice of correcting rate mistakes.

Because the court made factual findings supporting the determination that the department breached its contractual duties and there is record support for these findings, we may not disturb them on appeal. *See FDIC v. Bowen, supra.*

We also reject the department's assertion that there was an insufficient factual basis for awarding damages. As noted earlier, the trial court found that RMHMO had suffered damages in the amount of $15,000,000, which was considerably less than the amount sought by RMHMO. Because there is record support for that finding, we may not disturb it on appeal. *See FDIC v. Bowen, supra.*

Given our conclusion, we do not address the alternative theories relied upon by the trial court in support of the judgment. We have also considered and rejected the department's remaining contentions.

Judgment affirmed.

Judge RULAND and Judge STERNBERG,** concur.

** Sitting by assignment of the Chief Justice under the provisions of the Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2001.